367 F.3d 110
 In re HALSTEAD ENERGY CORP., et al., Debtors,
Warex Terminals Inc., Mid-Valley Oil Co., Inc., Plaintiffs — Appellants,
v.
Halstead Energy, Halstead Quinn Propane, Inc., Defendants — Appellees.
 Docket No. 02-5040.
 United States Court of Appeals, Second Circuit.
 Argued: June 27, 2003.
 Decided: May 11, 2004.
 
 Igor Krol, Krol & O'Connor, New York, NY, for Plaintiffs-Appellants.
 Douglas S. Skalka, Neubert, Pepe & Monteith, P.C. (Ray Y. Chan, on the brief), New Haven, CT, for Defendants-Appellees.
 Before: STRAUB and POOLER, Circuit Judges, HURD, District Judge.*
 HURD, District Judge, filed an opinion concurring in part, dissenting in part.
 POOLER, Circuit Judge.
 
 
 1
 Beginning in 1993, A. Tarricone, Inc. ("ATI") and HQP issued three promissory notes totaling $390,000, as joint and several obligors, to Warex for gasoline purchased on credit (the "Notes"). ATI and HQP secured their obligations under the Notes by mortgages on two properties owned by ATI and a third piece of property owned by its affiliate, Majac Enterprises, Inc. ATI and HQP also executed security agreements.
 
 
 2
 ATI is owned by three individuals who are officers and directors of Halstead Energy and HQP. ATI owned, managed and operated a chain of gasoline service stations. In 1993, ATI leased some of its stations to HQP, which sublet some of the stations to Mid-Valley. Pursuant to the sublease, Mid-Valley was required to pay rent and remediation costs to HQP. Mid-Valley had a right to set off the remediation costs that it incurred during the first five years against rent due and owing during the last five years (the "set-off"). If rent payments were insufficient to set off the remediation costs, HQP was required to pay the excess at the end of the sublease. Further, the sublease required Mid-Valley to make certain equipment upgrades but permitted it to recoup the cost of these upgrades if HQP rejected the sublease.
 
 
 3
 On June 10, 1997, ATI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court (Hardin, J.). On October 13, 1997, Warex filed a secured claim for $266,216.65, alleging that this amount was the remaining debt on the Notes. Warex and ATI negotiated and entered into a settlement agreement whereby ATI would transfer two gas stations ("ATI Properties"), which at the time were leased to HQP, to Warex in satisfaction of Warex's claim under the Notes. ATI submitted an application to settle this claim to the bankruptcy court on December 22, 1998, which stated that "[t]he Settlement Agreement settles all claims between the Debtor [ATI] and Warex relating to or in connection with the Properties and the Notes, respectively." Application In Support of Settlement at 6 (No. 99-20821) (Dec. 22, 1998); Record at 126. On January 20, 1999, the bankruptcy court issued an order approving the settlement ("Settlement Order"), in part, because it would result in "release, by operation of law, of Warex's secured claims in excess of $250,000.00 against the Debtor including a release of any deficiency claim against the Debtor and its estate." The Settlement Order, however, would become null and void unless HQP surrendered its leases and subleases "to Warex for, and in consideration of, the release from liability to Warex in proportion to its interest therein."
 
 
 4
 Annexed to the Settlement Order is a contract of sale between ATI and Mid-Valley, Warex's nominee to take the ATI Properties. Section 19.01 of the rider to the contract provides:
 
 
 5
 This agreement and the obligations of the parties hereunder are also expressly conditioned hereby upon Halstead-Quinn's (i) surrender of its lease with ATI and sublease with Mid-Valley of the Premises to Purchaser for, and in consideration of, the release from liability to Warex in proportion to its interest therein....
 
 
 6
 Also attached to the contract was a document, entitled Schedule C, setting forth the purchase price of the ATI Properties:
 
 
 7
 The Purchase Price shall be paid by (i) credit to Seller on account of debt in the aggregate amount of $266,216.65, owed by Seller to Warex for the purchase of gasoline ...; (ii) releasing Seller and Halstead-Quinn — to the extent of the Purchase Price — from its obligations to Warex under the Notes, the Security Agreements and the Mortgages.
 
 
 8
 The ATI Properties, however, were not transferred until September 1999, and only after the bankruptcy court twice extended ATI's time to perform.
 
 
 9
 In July 1999, HQP also filed a petition for Chapter 11 protection in the bankruptcy court. Warex filed a proof of claim alleging HQP's liability under the Notes, which it valued at "$266,216.65 less $250,000, plus various add-ons." The theory underlying its claim was that its prior settlement with ATI did not fully satisfy the debt owing on the Notes. HQP, as co-obligor of the Notes, was responsible for paying additional amounts due under the Notes, including the interest that had accrued during the two years between ATI's bankruptcy filing and HQP's bankruptcy filing.
 
 
 10
 During the reorganization process, HQP sought to dispose of several properties improved by gas stations. ATI leased these properties to HQP, which sublet some of them to Mid-Valley ("HQP Properties") for a term of ten years. Mid-Valley objected to HQP's plan to sell the leases on properties that it subleased from Mid-Valley free and clear of its sublease, but withdrew its objection "when HQ[P] agreed to sell the leases subject to the subleases." The auction, conducted by the bankruptcy court, took place on March 20, 2001. Warex, the only bidder, purchased the HQP Properties at Mid-Valley's request and with Mid-Valley's funds. On June 15, 2001, the bankruptcy court approved the sale and assignment of ATI's and HQP's interests in the HQP Properties to Warex:
 
 
 11
 The transfer authorized herein of the Mid-Valley Stations to Warex Terminals in fee simple (ATI) or by assignment (HQ[P]), as the case may be, shall be free and clear of all liens, claims, mortgages, encumbrances, interests and security interests of any kind ... except for Mid-Valley's rights under § 365(h) of the Bankruptcy Code (and accordingly, Warex Terminals as the purchaser and assignee of the ATI Properties and HQ Leases shall be purchasing and accepting the assignment of such assets subject to Mid-Valley's rights under § 365(h) of the Bankruptcy Code).
 
 
 12
 Mid-Valley filed two proofs of claim against HQP on January 7, 2000 and May 29, 2001, respectively. The first claim demanded undetermined and contingent damages for HQP's alleged breach of its sublease with Mid-Valley. The second claim demanded $387,500, the amount that supposedly represented the value of the set-off.
 
 
 13
 On November 28, 2001, the bankruptcy court, after receiving extensive briefing and hearing oral argument, dismissed both Warex's claim regarding the Notes and Mid-Valley's claim regarding the auction of ATI's and HQP's leasehold interest in the HQP properties. The bankruptcy court rejected Warex's claim by finding that since the settlement agreement released any and all obligations owed under the Notes, "there was no claim remaining against either ATI or Halstead Quinn ... in respect of those three notes because that liability was released and discharged by the conveyance." It further found that ATI's settlement with Warex regarding the Notes "was intended and written in such a manner as to release both ATI and Halstead Quinn of liability." Thus, once the settlement agreement was made, according to the bankruptcy court, there was no longer any debt owed to Warex by HQP or ATI, and HQP was therefore not obligated to pay any additional amounts or accrued interest as a matter of law. The bankruptcy court found that, pursuant to "fundamental principles of law," HQP was released once ATI was released.
 
 
 14
 Mid-Valley's claim for $387,500, the amount it allegedly gave Warex to pay for the leases, was based on its theory that HQP materially breached the 10-year sublease by "rejecting" the unexpired subleases, which thereby entitled Mid-Valley to pursue HQP for the promised set-off. The bankruptcy court, characterizing this argument as "next to frivolous," rejected this claim because Mid-Valley's right to the set-off under the sublease remained valid and enforceable against Warex, the purchaser and assignee of the lease.
 
 
 15
 Both Mid-Valley and Warex appealed to the district court (Hellerstein, J.), which affirmed the bankruptcy court's rulings. The district court rejected Warex's claim because "[i]t's a proposition of law that failure to reserve any rights against the joint obligor when the rights are released against the other joint obligor constitutes an extension [sic] of the debt against both," and because the Notes represented only one debt, which the transfer of the ATI Properties released. Tr. of Hearing (No. 99-20821) (May 2, 2002); Record at 39, 43. It also adopted the bankruptcy court's reasoning for rejecting Mid-Valley's claim that HQP improperly rejected the sublease when it sold the HQP Properties to Warex.
 
 DISCUSSION
 
 16
 An appeal from a district court's review of a bankruptcy court ruling is subject to plenary review. See In re Bell, 225 F.3d 203, 209 (2d Cir.2000). We accept the bankruptcy court's findings of fact unless clearly erroneous, but review its conclusions of law de novo. Id.
 
 A. Warex's Claim: Promissory Notes
 
 17
 Although ATI transferred the two ATI Properties to Warex in satisfaction of Warex's claim on the Notes, Warex argues that it was nonetheless entitled to recover additional sums, including accrued interest, from HQP. HQP responds by arguing that the parties intended the ATI-Warex settlement agreement, specifically the purchase price of the ATI Properties referenced in Schedule C, to represent Warex's full claim under the Notes. We agree with Warex and hold that there was insufficient evidence in the record showing that the parties intended the settlement agreement to satisfy the full amount then due under the Notes in full and final satisfaction of both ATI's and HQP's debts thereunder.
 
 
 18
 The settlement agreement, while fully extinguishing ATI's indebtedness to Warex under the Notes, does not clearly indicate the extent of the release to HQP. Section 19.01 of the rider requires HQP to "surrender ... its lease with ATI and subleases with Mid-Valley of the Premises to Purchaser for, and in consideration of, the release from liability to Warex in proportion to its interest therein." Rider to Contract, at 8 (Jan. 20, 1999) (emphasis added). Schedule C of the agreement states that the Purchase Price shall "releas[e] Seller [ATI] and Halstead-Quinn — to the extent of the Purchase Price — from its obligations to Warex under the Notes." Reading the rider and Schedule C together, it is reasonable to conclude that under Schedule C, HQP is released only to the extent of the purchase price of $266,216.65, and that pursuant to the rider, HQP is additionally released to the extent of the surrendered lease and sublease, the value of which is not set forth in the record. But nowhere in these documents is HQP given a total release of its obligations under the Notes. The language "in proportion to its interest therein" does not unambiguously indicate that the debt under the Notes was fully extinguished by the transfer of the ATI Properties to Warex, nor that any debt remaining after ATI's release was satisfied by HQP's surrender of the subleases. Accordingly, HQP may be indebted to Warex under the Notes for the value of the Notes, plus the appropriate accrued interest (to be determined by the bankruptcy court), minus (1) $266,216.65, the purchase price of the ATI Properties; and (2) the value of the lease and subleases surrendered by HQP.
 
 
 19
 The dissent argues that the settlement agreement fully extinguished both ATI's and Warex's obligation under the Notes. The documents relating to the settlement agreement, however, do not support this conclusion. For example, while the order approving the ATI-Warex settlement specifically provides for the "release by operation of law of Warex's secured claims in excess of $250,000.00 against [ATI] including a release of any deficiency claim against [ATI][,]" significantly, it does not provide for a release of any deficiency claim against HQP. Further, the settlement agreement and the rider explicitly provide "a credit to ATI in the amount of $250,000[,]" and do not suggest a full release or a credit to HQP. Rider to Contract, at 8 (emphasis added). In fact, Schedule C describes $266,216.65 as the full amount owed by "Seller" to Warex. However, the next paragraph makes clear that the intended meaning of "Seller" is ATI alone because it refers to Seller and Halstead-Quinn as two different entities, thereby suggesting that ATI's debt and HQP's debt were not identical. Finally, differences in ATI's debt and HQP's debt are underscored by the fact that HQP and ATI owed different amounts of interest. ATI filed for bankruptcy in June 1997 while HQP did not file for another two years. Warex would not have been entitled to interest from ATI for the period after filing, but it continued to be entitled to interest from HQP between June 1997 and July 1999, when HQP finally filed for bankruptcy protection. See In re Milham, 141 F.3d 420, 423 (2d Cir.1998).
 
 
 20
 The dissent argues that since ATI satisfied its obligations on the Notes, then the obligations of HQP, its co-obligor, are likewise extinguished. Dissent at 3-4. However, it is possible for ATI to settle its liability to Warex for the Notes without the Notes being fully satisfied and without releasing HQP. In fact, New York statutory law, New York General Obligation Law § 15-105, acknowledges that a co-obligor's liability for a note may remain even after another obligor extinguishes its duties on the debt. The statute creates a mechanism for determining the co-obligor's remaining obligations where the obligee fails to expressly reserve its rights after releasing or discharging another obligor. It states:
 
 
 21
 1. If an obligee releasing or discharging an obligor without express reservation of rights against a co-obligor, then knows or has reason to know that the obligor released or discharged did not pay so much of the claim as he was bound by his contract or relation with that co-obligor to pay, the obligee's claim against that co-obligor shall be satisfied to the amount which the obligee knew or had reason to know that the released or discharged obligor was bound to such co-obligor to pay.
 
 
 22
 2. If an obligee so releasing or discharging an obligor has not then such knowledge or reason to know, the obligee's claim against the co-obligor shall be satisfied to the extent of the lesser of two amounts, namely (a) the amount of the fractional share of the obligor released or discharged, or (b) the amount that such obligor was bound by his contract or relation with the co-obligor to pay.
 
 
 23
 N.Y. GEN. OBLIG. LAW § 15-105. Where a creditor does not explicitly reserve rights — as Warex concedes is the case here — New York law provides that the creditor's claim is satisfied to the extent that the creditor knew or had reason to know that the discharged obligor was bound to such co-obligor to pay. Accordingly, the question of whether HQP owes Warex additional amounts under the Notes, including accrued interest, hinges on the extent of Warex's knowledge of an agreement between HQP and ATI as to the respective amounts they were each contractually obligated to pay. If Warex had no such knowledge, Warex's claim then falls under section 15-105(2) and should be resolved accordingly.
 
 
 24
 For the foregoing reasons, we must vacate this portion of the bankruptcy court's order and remand this case for a factual determination of the following issues: (1) the intent of the parties when ATI settled with Warex, and its understanding with regard to HQP's remaining obligations; (2) the value of the leases and subleases transferred by HQP to Warex pursuant to the settlement agreement; (3) to what extent Warex knew or had reason to know ATI's and HQP's respective obligations under the Notes, and (4) generally, the total value of HQP's indebtedness to Warex under the Notes.
 
 B. Mid-Valley's Claim: Subleases
 
 25
 On appeal, Mid-Valley renews its claim that HQP improperly rejected its sublease by selling the sublet properties to Warex, and that it is entitled to recover the value of the set-off under the sublease. It mainly argues that it made capital improvements and environmental remediation to the properties during the first five years of the sublease and was entitled to then credit these expenditures against the rent due for the remaining five-year period. Mid-Valley argues that it consequently has a claim for the value of the set-off. We disagree.
 
 
 26
 No documents in the record show that HQP rejected the subleases; rather, it is clear that the subleases were properly assigned to and assumed by Warex and that this resulting transfer of interest in no way encroached upon any of Mid-Valley's rights. First, the bankruptcy court's order approving the sale of HQP Properties to Warex unequivocally states that the transfer of the properties "shall be free and clear of all liens, claims, mortgages, encumbrances, interests and security interests of any kind ... except for Mid-Valley's rights under § 365(h) of the Bankruptcy Code" and that Warex, "as the purchaser and assignee of the [properties], shall be purchasing and accepting the assignment of such assets subject to Mid-Valley's rights." As this passage makes clear, Mid-Valley's rights under § 365(h) were specifically preserved because its ability to recoup its capital investments via the set-off was transferred from ATI and HQP to Warex. Second, HQP had not contracted to pay Mid-Valley for the expenditures incurred, but to credit the rent due in the last five years of the lease term. This set-off is not currently denied Mid-Valley because it may be asserted against Warex. Indeed, this set-off provision was a clear term that Warex (at the direction of Mid-Valley) choose to accept when it purchased the HQP Properties. Finally, the fact that Mid-Valley effectively purchased its own lease through Warex was of little consequence because Warex "chose to structure" the arrangement in this manner. The bankruptcy court correctly found "that the common owner of Warex and Mid Valley selected for Warex to play the game and be the purchaser of the leases and subleases in question, and that's what they did." Tr. of Chapter 11 Hearing (No. 99-20821); Record at 24-25.
 
 
 27
 It is clear that the bankruptcy court correctly concluded that Mid-Valley's rights under its sublease arrangement with HQP, and specifically its right to a rent offset, were preserved because they are enforceable against Warex; this thereby leaves HQP free from any liability to Mid-Valley. For these reasons, we hereby AFFIRM the bankruptcy court's order dismissing Mid-Valley's claim.
 
 CONCLUSION
 
 28
 For the reasons stated above, we hereby VACATE and REMAND this case for a factual determination regarding the total value of HQP's remaining indebtedness to Warex under the Notes, and we affirm the dismissal of Mid-Valley's claim against HQP.
 
 
 
 Notes:
 
 
 *
 The Honorable David N. Hurd, United States District Judge for the Northern District of New York, sitting by designation
 
 
 
 29
 HURD, District Judge, concurring in part, dissenting in part.
 
 
 30
 I respectfully dissent from the vacatur and remand for a factual determination of the intent of the parties at the time of the settlement between ATI and Warex, Warex's understanding of HQP's remaining obligations, and the value of leases and subleases transferred by HQP to Warex pursuant to the settlement order. However, I join the affirmance of the Bankruptcy Court's order dismissing Mid-Valley's claim of entitlement to recover the value of the set-off under the sublease.
 
 
 31
 In addition to affirming the Bankruptcy Court's order dismissing Mid-Valley's claim, I would affirm its decision dismissing Warex's claim regarding the Notes. The Bankruptcy Court found that the settlement agreement satisfied all obligations (both of ATI and HQP) owed under the Notes, therefore, there was no remaining claim by Warex against HQP.
 
 
 32
 Sufficient evidence exists in the record from which the Bankruptcy Court could find that the parties' intent in entering into the settlement agreement was that the transfer of the properties by ATI and the subleases by HQP would fully satisfy their indebtedness to Warex. Therefore, the Bankruptcy Court's finding in this regard was not clearly erroneous.
 
 
 33
 In 1993, ATI and HQP signed the Notes evidencing their indebtedness, as co-obligors, to Warex in the amount of $390,000. At the time ATI filed for bankruptcy protection in 1997, the principal amount owed on the Notes was approximately $250,000, along with interest of about $16,000, for a total indebtedness of $266,216.65. Warex, ATI, and HQP were heavily involved in settlement negotiations, as was the Bankruptcy Court. ATI wished to avoid foreclosure of its two properties valued at $250,000, while Warex wished to recover the maximum possible amount owed to it by a debtor-in-bankruptcy. Although at that time HQP was not in bankruptcy, it was a co-obligor on ATI's indebtedness to Warex. In addition, HQP had leasehold interests in the properties that were to be transferred, with which to bargain, and Warex did not want to take possession of the property subject to those leaseholds. Finally, although the Bankruptcy Court did not value the leasehold interests, it did approve the settlement agreement. At bare bones the settlement agreement was as follows: property valued at $250,000 along with a leasehold interest in the property is transferred to the creditor in exchange for extinguishment of a debt in the aggregate amount of $266,216.65.
 
 
 34
 There is no doubt, as the majority notes, that "a co-obligor's liability for a note may remain even after another obligor extinguishes its duties on the debt." Supra at [9] (emphasis added); N.Y. Gen. Oblig. L. § 15-105. However, the issue in this case is whether or not the liability of both obligors was fully satisfied by the settlement. Upon a review of all the facts, this issue was resolved in the affirmative by both lower courts.
 
 
 35
 The Bankruptcy Court found that "the Settlement will fully resolve and settle all claims between the Debtor and Warex relating to or in connection with the properties." The debtor, ATI, was obligated to Warex in the aggregate amount of $266,216.65. The settlement fully resolved ATI's obligation in the amount of $266,216.65. Thus, if the full amount of the obligation was satisfied as to ATI, it must also have been satisfied as to the co-obligor HQP. These facts fully support the Bankruptcy Court's later conclusion that the "release as to ATI is complete and unequivocal and a total release and discharge of the claim against ATI. That release alone would release the co-obligor under fundamental principles of law if it weren't clear, to me at least, that the document was intended and written in such a manner as to release both ATI and Halstead Quinn of liability."
 
 
 36
 As the District Court noted, "if you release and discharge the entire underlying debt, there is no more debt to pay." Similarly, if the underlying debt is discharged, interest no longer accrues. Thus, the argument that there was a difference in the debt of ATI and HQP due to interest accrued to HQP is fallacious. Again, as the District Court noted, "It was one debt for which the two were jointly and severally liable. It wasn't two separate debts, it was one debt. And this debt was released."
 
 
 37
 The rider to the contract of sale provides for surrender of the lease and sublease by HQP "for, and in consideration of, the release from liability to Warex in proportion to its interest therein." The majority relies upon the language "in proportion to its interest therein" to find that the settlement documents do not unambiguously indicate that the debt under the Notes was fully extinguished by the transfer of the ATI properties and surrender of the HQP subleases. However, given the finding of the Bankruptcy Court that all claims between ATI and Warex were resolved by the settlement (which is undisputedly correct), this "in proportion to" language merely indicates that while the properties were valued at $250,000 and the debt owed was about $260,000, the remaining proportion of the debt was satisfied with HQP's surrender of the leases. As the Bankruptcy Court stated, in rejecting Warex's argument that the "in proportion to language" indicated that the debt was not entirely extinguished by the settlement:
 
 
 38
 One has to engage in a forensic gymnastic that I'm not capable of to read that language as somehow releasing Warex only to some certain extent despite the language in the purchase price, that is to say Schedule C, which I've already read, which indicates that the conveyance of the properties is going to in essence retire the amount owing, which is recited here as 266,000 odd dollars, owed under the three promissory notes that are the source of the obligation of both [ATI] and [HQP], and the further recitation in the Schedule C of a release to the seller and Halstead Quinn.
 
 
 39
 Tr. of Chapter 11 Hearing (No. 99-20821); Record at 20-21 (emphasis added). As the Bankruptcy Court noted, Schedule C states that the seller [ATI] and HQP are released from their obligations to Warex under the promissory notes to the extent of the purchase price, identified as $266,216.65 in the previous paragraph. This language clearly indicates that the full obligations under the promissory notes, which was $266,216.65 at that time, were satisfied by the settlement.
 
 
 40
 Identification of ATI as the "seller" does not undermine the Bankruptcy Court's findings and conclusions. Rather, it is merely acknowledgment that the properties being transferred were owned by ATI (and not HQP).
 
 
 41
 Neither does language specifically providing for a release of any deficiency claim Warex might have against ATI, while not making any such provision with regard to HQP, since it was the claims against the bankruptcy estate of ATI that were mainly at issue. Further, the provision of a "credit" to ATI in the amount of $250,000 is explainable by the fact that $250,000 was the amount of Warex's secured claim against the ATI bankruptcy estate, rather than a suggestion that there was no full release or credit to HQP. Reading the terms of the settlement as a whole, it is clear that, while HQP was essential to reaching the agreement, the highest order of priority was preservation of the bankruptcy estate. The out-of-context provisions cited by the majority to indicate that the settlement agreement was not intended to fully satisfy the obligations evidenced by the Notes as against HQP, are, rather, merely attempts to protect the bankruptcy estate and establish that the settlement was in the best interests of the estate.
 
 
 42
 As the majority concedes, the settlement agreement fully extinguished ATI's indebtedness to Warex under the notes. ATI was obligated for the full amount of the indebtedness. It follows, then, that once the indebtedness was extinguished, Warex had no claim against the co-obligor HQP. The Bankruptcy Court's finding to this effect is well supported by the evidence in the record.
 
 
 43
 Finally, neither lower court found that Warex waived its rights against HQP by failing to expressly reserve rights against HQP when it settled with ATI. Rather, the lower courts found that the settlement fully satisfied the obligation of ATI and hence the obligation of HQP, since the obligations were one and the same. Thus, I would find no error in this regard, and no necessity for determining Warex's knowledge of any agreement between HQP and ATI. Therefore, I respectfully dissent, in part.