HURD, District Judge, filed an opinion concurring in part, dissenting in part.
POOLER, Circuit Judge.
Beginning in 1993, A. Tarricone, Inc. (“ATI”) and HQP issued three promissory notes totaling $390,000, as joint and several obligors, to Warex for gasoline purchased on credit (the “Notes”). ATI and HQP secured their obligations under the Notes by mortgages on two properties owned by ATI and a third piece of property owned by its affiliate, Majac Enterprises, Inc. ATI and HQP also executed security agreements.
ATI is owned by three individuals who are officers and directors of Halstead Energy and HQP. ATI owned, managed and operated a chain of gasoline service stations. In 1993, ATI leased some of its stations to HQP, which sublet some of the stations to Mid-Valley. Pursuant to the sublease, Mid-Valley was required to pay rent and remediation costs to HQP. Mid-Valley had a right to set off the remediation costs that it incurred during the first five years against rent due and owing during the last five years (the “set-off’). If rent payments were insufficient to set off the remediation costs, HQP was required to pay the excess at the end of the sublease. Further, the sublease required Mid-Valley to make certain equipment upgrades but permitted it to recoup the cost of these upgrades if HQP rejected the sublease.
On June 10, 1997, ATI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court (Hardin, J.). On Octo *112 ber 13, 1997, Warex filed a secured claim for $266,216.65, alleging that this amount was the remaining debt on the Notes. Warex and ATI negotiated and entered into a settlement agreement whereby ATI would transfer two gas stations (“ATI Properties”), which at the time were leased to HQP, to Warex in satisfaction of Warex’s claim under the Notes. ATI submitted an application to settle this claim to the bankruptcy court on December 22, 1998, which stated that “[t]he Settlement Agreement settles all claims between the Debtor [ATI] and Warex relating to or in connection with the Properties and the Notes, respectively.” Application In Support of Settlement at 6 (No. 99-20821) (Dec. 22, 1998); Record at 126. On January 20, 1999, the bankruptcy court issued an order approving the settlement (“Settlement Order”), in part, because it would result in “release, by operation of law, of Warex’s secured claims in excess of $250,000.00 against the Debtor including a release of any deficiency claim against the Debtor and its estate.” The Settlement Order, however, would become null and void unless HQP surrendered its leases and subleases “to Warex for, and in consideration of, the release from liability to Warex in proportion to its interest therein.”
Annexed to the Settlement Order is a contract of sale between ATI and Mid-Valley, Warex’s nominee to take the ATI Properties. Section 19.01 of the rider to the contract provides:
This agreement and the obligations of the parties hereunder are also expressly conditioned hereby upon Halstead-Quinn’s (i) surrender of its lease with ATI and sublease with Mid-Valley of the Premises to Purchaser for, and in consideration of, the release from liability to Warex in proportion to its interest therein....
Also attached to the contract was a document, entitled Schedule C, setting forth the purchase price of the ATI Properties:
The Purchase Price shall be paid by (i) credit to Seller on account of debt in the aggregate amount of $266,216.65, owed by Seller to Warex for the purchase of gasoline ...; (ii) releasing Seller and Halstead-Quinn — -to the extent of the Purchase Price — from its obligations to Warex under the Notes, the Security Agreements and the Mortgages.
The ATI Properties, however, were not transferred until September 1999, and only after the bankruptcy court twice extended ATI’s time to perform.
In July 1999, HQP also filed a petition for Chapter 11 protection in the bankruptcy court. Warex filed a proof of claim alleging HQP’s liability under the Notes, which it valued at “$266,216.65 less $250,000, plus various add-ons.” The theory underlying its claim was that its prior settlement with ATI did not fully satisfy the debt owing on the Notes. HQP, as co-obligor of the Notes, was responsible for paying additional amounts due under the Notes, including the interest that had accrued during the two years between ATI’s bankruptcy filing and HQP’s bankruptcy filing.
During the reorganization process, HQP sought to dispose of several properties improved by gas stations. ATI leased these properties to HQP, which sublet some of them to Mid-Valley (“HQP Properties”) for a term of ten years. Mid-Valley objected to HQP’s plan to sell the leases on properties that it subleased from Mid-Valley free and clear of its sublease, but withdrew its objection “when HQ[P] agreed to sell the leases subject to the subleases.” The auction, conducted by the bankruptcy court, took place on March 20, 2001. Wa-rex, the only bidder, purchased the HQP Properties at Mid-Valley’s request and *113 with Mid-Valley’s funds. On June 15, 2001, the bankruptcy court approved the sale and assignment of ATI’s and HQP’s interests in the HQP Properties to Warex:
The transfer authorized herein of the Mid-Valley Stations to Warex Terminals in fee simple (ATI) or by assignment (HQ[P]), as the case may be, shall be free and clear of all liens, claims, mortgages, encumbrances, interests and security interests of any kind ... except for Mid-Valley’s rights under § 365(h) of the Bankruptcy Code (and accordingly, Warex Terminals as the purchaser and assignee of the ATI Properties and HQ Leases shall be purchasing and accepting the assignment of such assets subject to Mid-Valley’s rights under § 365(h) of the Bankruptcy Code).
Mid-Valley filed two proofs of claim against HQP on January 7, 2000 and May 29, 2001, respectively. The first claim demanded undetermined and contingent damages for HQP’s alleged breach of its sublease with Mid-Valley. The second claim demanded $387,500, the amount that supposedly represented the value of the set-off.
On November 28, 2001, the bankruptcy court, after receiving extensive briefing and hearing oral argument, dismissed both Warex’s claim regarding the Notes and Mid-Valley’s claim regarding the auction of ATI’s and HQP’s leasehold interest in the HQP properties. The bankruptcy court rejected Warex’s claim by finding that since the settlement agreement released any and all obligations owed under the Notes, “there was no claim remaining against either ATI or Halstead Quinn ... in respect of those three notes because that liability was released and discharged by the conveyance.” It further found that ATI’s settlement with Warex regarding the Notes “was intended and written in such a manner as to release both ATI and Halstead Quinn of liability.” Thus, once the settlement agreement was made, according to the bankruptcy court, there was no longer any debt owed to Warex by HQP or ATI, and HQP was therefore not obligated to pay any additional amounts or accrued interest as a matter of law. The bankruptcy court found that, pursuant to “fundamental principles of law,” HQP was released once ATI was released.
Mid-Valley’s claim for $387,500, the amount it allegedly gave Warex to pay for the leases, was based on its theory that HQP materially breached the 10-year sublease by “rejecting” the unexpired subleases, which thereby entitled Mid-Valley to pursue HQP for the promised set-off. The bankruptcy court, characterizing this argument as “next to frivolous,” rejected this claim because Mid-Valley’s right to the set-off under the sublease remained valid and enforceable against Warex, the purchaser and assignee of the lease.
Both Mid-Valley and Warex appealed to the district court (Hellerstein, J.), which affirmed the bankruptcy court’s rulings. The district court rejected Warex’s claim because “[fit’s a proposition of law that failure to reserve any rights against the joint obligor when the rights are released against the other joint obligor constitutes an extension [sic] of the debt against both,” and because the Notes represented only one debt, which the transfer of the ATI Properties released. Tr. of Hearing (No. 99-20821) (May 2, 2002); Record at 39, 43. It also adopted the bankruptcy court’s reasoning for rejecting Mid-Valley’s claim that HQP improperly rejected the sublease when it sold the HQP Properties to Warex.
DISCUSSION
An appeal from a district court’s review of a bankruptcy court ruling is subject to plenary review. See In re Bell, *114 225 F.3d 203, 209 (2d Cir.2000). We accept the bankruptcy court’s findings of fact unless clearly erroneous, but review its conclusions of law de novo. Id.
A. Warex’s Claim: Promissory Notes
Although ATI transferred the two ATI Properties to Warex in satisfaction of Warex’s claim on the Notes, Warex argues that it was nonetheless entitled to recover additional sums, including accrued interest, from HQP. HQP responds by arguing that the parties intended the ATI-Warex settlement agreement, specifically the purchase price of the ATI Properties referenced in Schedule C, to represent Warex’s full claim under the Notes. We agree with Warex and hold that there was insufficient evidence in the record showing that the parties intended the settlement agreement to satisfy the full amount then due under the Notes in full and final satisfaction of both ATI’s and HQP’s debts thereunder.
The settlement agreement, while fully extinguishing ATI’s indebtedness to Warex under the Notes, does not clearly indicate the extent of the release to HQP. Section 19.01 of the rider requires HQP to “surrender ... its lease with ATI and subleases with Mid-Valley of the Premises to Purchaser for, and in consideration of, the release from liability to Warex in proportion to its interest therein.” Rider to Contract, at 8 (Jan. 20, 1999) (emphasis added). Schedule C of the agreement states that the Purchase Price shall “re-leas[e] Seller [ATI] and Halstead-Quinn— to the extent of the Purchase Price — from its obligations to Warex under the Notes.” Reading the rider and Schedule C together, it is reasonable to conclude that under Schedule C, HQP is released only to the extent of the purchase price of $266,216.65, and that pursuant to the rider, HQP is additionally released to the extent of the surrendered lease and sublease, the value of which is not set forth in the record. But noiohere in these documents is HQP given a total release of its obligations under the Notes. The language “in proportion to its interest therein” does not unambiguously indicate that the debt under the Notes was fully extinguished by the transfer of the ATI Properties to Warex, nor that any debt remaining after ATI’s release was satisfied by HQP’s surrender of the subleases. Accordingly, HQP may be indebted to Warex under the Notes for the value of the Notes, plus the appropriate accrued interest (to be determined by the bankruptcy court), minus (1) $266,216.65, the purchase price of the ATI Properties; and (2) the value of the lease and subleases surrendered by HQP.
The dissent argues that the settlement agreement fully extinguished both ATI’s and Warex’s obligation under the Notes. The documents relating to the settlement agreement, however, do not support this conclusion. For example, while the order approving the ATI-Warex settlement specifically provides for the “release by operation of law of Warex’s secured claims in excess of $250,000.00 against [ATI] including a release of any deficiency claim against [ATI][,]” significantly, it does not provide for a release of any deficiency claim against HQP. Further, the settlement agreement and the rider explicitly provide “a credit to ATI in the amount of $250,000[,]” and do not suggest a full release or a credit to HQP. Rider to Contract, at 8 (emphasis added). In fact, Schedule C describes $266,216.65 as the full amount owed by “Seller” to Warex. However, the next paragraph makes clear that the intended meaning of “Seller” is ATI alone because it refers to Seller and Halstead-Quinn as two different entities, thereby suggesting that ATI’s debt and HQP’s debt were not identical. Finally, differences in ATI’s debt and HQP’s debt are underscored by the fact that HQP and *115 ATI owed different amounts of interest. ATI filed for bankruptcy in June 1997 while HQP did not file for another two years. Warex would not have been entitled to interest from ATI for the period after filing, but it continued to be entitled to interest from HQP between June 1997 and July 1999, when HQP finally filed for bankruptcy protection. See In re Milham, 141 F.3d 420, 423 (2d Cir.1998).
The dissent argues that since ATI satisfied its obligations on the Notes, then the obligations of HQP, its co-obligor, are likewise extinguished. Dissent at 3^. However, it is possible for ATI to settle its liability to Warex for the Notes without the Notes being fully satisfied and without releasing HQP. In fact, New York statutory law, New York General Obligation Law § 15-105, acknowledges that a co-obligor’s liability for a note may remain even after another obligor extinguishes its duties on the debt. The statute creates a mechanism for determining the co-obligor’s remaining obligations where the obligee fails to expressly reserve its rights after releasing or discharging another obligor. It states:
1. If an obligee releasing or discharging an obligor without express reservation of rights against a co-obligor, then knows or has reason to know that the obligor released or discharged did not pay so much of the claim as he was bound by his contract or relation with that co-obligor to pay, the obligee’s claim against that co-obligor shall be satisfied to the amount which the obligee knew or had reason to know that the released or discharged obligor was bound to such co-obligor to pay.
2. If an obligee so releasing or discharging an obligor has not then such knowledge or reason to know, the obli-gee’s claim against the co-obligor shall be satisfied to the extent of the lesser of two amounts, namely (a) the amount of the fractional share of the obligor released or discharged, or (b) the amount that such obligor was bound by his contract or relation with the co-obligor to pay.
N.y. gen. oblig. law § 15-105. Where a creditor does not explicitly reserve rights — as Warex concedes is the case here — New York law provides that the creditor’s claim is satisfied to the extent that the creditor knew or had reason to know that the discharged obligor was bound to such co-obligor to pay. Accordingly, the question of whether HQP owes Warex additional amounts under the Notes, including accrued interest, hinges on the extent of Warex’s knowledge of an agreement between HQP and ATI as to the respective amounts they were each contractually obligated to pay. If Warex had no such knowledge, Warex’s claim then falls under section 15-105(2) and should be resolved accordingly.
For the foregoing reasons, we must vacate this portion of the bankruptcy court’s order and remand this case for a factual determination of the following issues: (1) the intent of the parties when ATI settled with Warex, and its understanding with regard to HQP’s remaining obligations; (2) the value of the leases and subleases transferred by HQP to Warex pursuant to the settlement agreement; (3) to what extent Warex knew or had reason to know ATI’s and HQP’s respective obligations under the Notes, and (4) generally, the total value of HQP’s indebtedness to Wa-rex under the Notes.
B. Mid-Valley’s Claim: Subleases
On appeal, Mid-Valley renews its claim that HQP improperly rejected its sublease by selling the sublet properties to Warex, and that it is entitled to recover the value of the set-off under the sublease. *116 It mainly argues that it made capital improvements and environmental remediation to the properties during the first five years of the sublease and was entitled to then credit these expenditures against the rent due for the remaining five-year period. Mid-Valley argues that it consequently has a claim for the value of the set-off. We disagree.
No documents in the record show that HQP rejected the subleases; rather, it is clear that the subleases were properly assigned to and assumed by Warex and that this resulting transfer of interest in no way encroached upon any of Mid-Valley’s rights. First, the bankruptcy court’s order approving the sale of HQP Properties to Warex unequivocally states that the transfer of the properties “shall be free and clear of all liens, claims, mortgages, encumbrances, interests and security interests of any kind ... except for Mid-Valley’s rights under § 365(h) of the Bankruptcy Code” and that Warex, “as the purchaser and assignee of the [properties], shall be purchasing and accepting the assignment of such assets subject to Mid-Valley’s rights.” As this passage makes clear, Mid-Valley’s rights under § 365(h) were specifically preserved because its ability to recoup its capital investments via the set-off was transferred from ATI and HQP to Warex. Second, HQP had not contracted to pay Mid-Valley for the expenditures incurred, but to credit the rent due in the last five years of the lease term. This set-off is not currently denied Mid-Valley because it may be asserted against Warex. Indeed, this set-off provision was a clear term that Warex (at the direction of Mid-Valley) choose to accept when it purchased the HQP Properties. Finally, the fact that Mid-Valley effectively purchased its own lease through Warex was of little consequence because Warex “chose to structure” the arrangement in this manner. The bankruptcy court correctly found “that the common owner of Warex and Mid Valley selected for Warex to play the game and be the purchaser of the leases and subleases in question, and that’s what they did.” Tr. of Chapter 11 Hearing (No. 99-20821); Record at 24-25.
It is clear that the bankruptcy court correctly concluded that Mid-Valley’s rights under its sublease arrangement with HQP, and specifically its right to a rent offset, were preserved because they are enforceable against Warex; this thereby leaves HQP free from any liability to Mid-Valley. For these reasons, we hereby AFFIRM the bankruptcy court’s order dismissing Mid-Valley’s claim.
CONCLUSION
For the reasons stated above, we hereby Vaoate and Remand this case for a factual determination regarding the total value of HQP’s remaining indebtedness to Warex under the Notes, and we affirm the dismissal of Mid-Valley’s claim against HQP.